Judge Wright
delivered the opinion of the court:
It is difficult gravely to respond to such an assignment of errors as is made on this record, or to grope one’s way along the labyrinth of the many bills of exception it presents. I must, therefore, try to generalize.
The first objections taken in the court below were to the array. These were made after challenges for cause had been interposed and decided, and the jurymen had taken their seats. They were :
1. That the venire only contained the names of the petit jury, when it should have contained the names of the grand jury also. This was overruled. The defendant then moved to set aside the venire, and offered to prove, in support of his motion:
1. That the apportionment of jurors by the clerk was not in the ratio of the number of free white males in each township, as required by law.
2. That the clerk did not make a written statement of his doings, and give it to the sheriff.
3. That the apportionment was not made on the first Monday of September.
The court refused to hear the motion, and overruled the evidence offered in support of it.
What is erroneous in this proceeding ? The venire should not have included the grand jury. They are distinct bodies, and should be separately summoned. The statute, as we understand it does not require the two juries to be included in *the same [21 *22 writ. The other objections to the jury, if all the party offered to prove be admitted as true, have no better foundation. The clerk is required by law, the first Monday of September, annually, to proportion the jurors for the year, among the free white males of twenty-one years old, in the respective townships, and give the ■same to the sheriff in writing, who, when he proclaims the October elections, is required to annex a notification to the trustees of townships of the number of jurors apportioned to each township. The trustees are, on the day of the election, to select good, judicious men, to the number required, and transmit their names to the •clerk. The names of the jurors thus selected, are written upon separate pieces of paper, and put into a box, from which the clerk, in the presence of the sheriff, thirty days before each court, draws ■out twenty-seven ballots, the first fifteen of whom are to be summoned as grand jurors, and the remaining twelve as petit jurors. This statutory direction to the officers should be substantially followed, yet we are not prepared to say that unessential variations would be regarded as affecting the array. We have never known, ■in this state, an objection of this kind before. The profession, by universal consent, refuse to notice such matters, as this in no way ■endangers a fair trial. The objection at best was a mere technical one, and, in the opinion of the court below, was not made in technical time. Technicality is never more appropriately resorted to, than to meet and put down technical objections.
The record shows that, during the trial, it was proven that the ■defendant, about noon, hired Mason to go with his team about twelve miles, for a load of merchandise, and gave him money to pay his expenses for the night. Mason went for the load, but instead of staying over night, returned about dusk, came home the back way to avoid observation, and early went to bed with his wife. About ten o’clock, footsteps were heard approaching. The ■defendant came on to the porch, tried to enter by each of two doors, but finding both fastened, he approached the window and passed it. He soon turned again, raised the window six or eight inches, and let it down again. He again raised it, and fastened it up; then, partly entering, the blind hit his back, and he withdrew, stood erect a short time, and then slowly and gently crept through the window into the house. When in, he seized the bed •clothes on Mrs. Mason’s shoulder, and pulled'them down. At this 22] instant, *Mason sprung from the bed, seized the defendant by *23 the hair of his head, threw him down, and held him until he begged for quarter. He was then let up, and having got his hat and shoes from the porch, was taken into another room, and detained for a time.
The. legal questions presented by the counsel for the defendant, for the decision of the court during the progress of the trial, as we gather them from the record, may be resolved into two propositions :
1. Whether, in case the defendant entered the house with intent to commit adultery, and is foiled in effecting his object, he can be convicted, under the indictment, of breaking and entering and. perpetrating any other unlawful act.
2. Whether in such case, it is competent for the defendant to prove that he was in the habit of visiting the wife, in her husband’s absence, for criminal intercourse, as a fact from which the jury may infer that he broke and entered the house, and laid hands ■on the wife, with such intent only, at the time complained of?
The statute, 29 Ohio L. 144, prescribes the punishment for breaking and entering a mansion-house in the night season, in which any person shall reside or dwell, and committing, or attempting to commit, any personal violence or abuse. The intent with which the party enters forms no ingredient of the offense. The inquiries presented by the statute are.: Did the accused break and enter the house in the night season? If so, did he commit, or attempt to commit, any personal abuse or violence? In this case, there was no question before the common pleas as to the breaking and entering .the house with an illegal design — that of committing adultery. While prosecuting this unlawful purpose, the defendant rudely laid hands upon Mrs. Mason, and thus committed an act of violence or abuse, though of a less heinous character than he intended. Is he not answerable? If one strike another with intent to kill or maim, but fails of his object, that failure does not excuse him from liability for the assault and battery. If, then, the laying hold of Mrs. Mason was an attempt to commit adultery, it was an attempt at abuse of her; an attempt to do just what in fact was done, though not carried out to the full fruition of his hopes. What principle of law is violated in such case, by describing the act done in legal language? The first and third counts in the indictment charge the actual commission of an assault *and battery; the second, an attempt [23 *24 •to commit one, and otherwise to ill-treat and abuse Mrs. Mason. The court, in resolving the propositions in the affirmative, in our opinion fell into no substantial error. The party is liable for the act done, if it be one of personal violence or abuse. The law does not require that those precise words should be inserted in the indictment, but only that some act shall be charged to have been done or attempted of that character. If the terms were less general, and limited the offense to a breaking and entering, and the-committing or attempting to commit an assault and battery, that particular act would be essential to the offense, and would have to be described.
The second general proposition, which conducts to the inquiries, how far the defendant had a right to protect himself, by reason of the consent of Mrs. Mason to his visiting her for criminal purposes, remains to be considered. The case made does not, in our opinion, require a very critical examination of this general proposition. We are not called upon to say whether one entering a house with the actual consent of the wife of the occupant, with a view to illicit intercourse, could be punished under the statute for breaking and entering the house. No such case is before us. The real question is: Would Mrs. Mason’s consent that the accused should visit her in the absence of her husband, or proof of his being in the habit of visiting her when her husband was absent, even íor a criminal purpose, conduce to prove her permission to him to break and enter the house for such purpose when the husband was present and by her side ? It is absurd to suppose so. The evidence rejected in that view, therefore, could not have benefited the defendant; and, if it could be of no advantage to him, he was not injured by its rejection. We incline to think a married woman incapable in law, by consent, to authorize a third person to break open and enter the house of her husband for an unlawful purpose. Such consent, though ever so formally given, could not justify or legalize an infraction of law, or sanctify an unlawful purpose, and will any one pretend that the entering a man’s house with intent to commit adultery with his wife, with any consent, save only that of the husband, is a lawful entry? Be this, however, as it may, the evidence of the defendant’s habit of visiting this woman, in this case, was properly rejected by the common pleas. The indictment does not charge the breaking and entering the house to 34] have been with any particular *intent, nor does the law re *25 quire the intent to be set forth. The charge is for breaking and entering (without reference to the intent), and committing and attempting to commit an assault and battery upon Mrs. Mason, and to ill use her. The offense is complete without reference to the design of the party in entering. The objection urged, that if the accused had obtained the consent of the wife'to the unlawful interview, neither she nor her husband had power to withdraw it, because it would be a fraud upon the rights conferred upon him by the consent, is one that can meet no countenance where any just moral perception is found. The proposition is novel in our courts, and is supposed to have found its way into the temples of justice, for the first time, in this case. Does an agreement to disregard the decent proprieties which bind society together, and to-trample under foot the laws of G-od and man, impose upon the parties to it a legal obligation to be enforced in the judicial tribunals of a Christian community? Is it true that confederates in-crime are to escape punishment in order that their criminal engagements may be performed ? Not so. The law holds void and of no effect all contracts whose object is to violate its injunctions, or those of good morals. In providing punishment for criminal acts, while the mere intention to commit them is overlooked, the law holds out perpetual encouragement to the evil-disposed to abstain from crime; and it carries out the design in proffering absolution from legal obligation to perform unlawful agreements. The-wanton, immoral, and illegal conduct, charged upon the defendant below, in our opinion, is in no degree excused or palliated by any supposed violation of the alleged contract of Mrs. Mason to become a partner in his guilt. We see nothing in the conduct of the trial by the court below which requires of us to reverse the sentence against the plaintiff in error.
We are called, however, to look to the indictment to ascertain if it charge an offense which warrants the conviction. The statute provides punishment for the breaking, etc., of any mansion-house in which any person shall reside or dwell. It is descriptive of the offense to allege that the house broken is the residence or dwelling-place of some one. The first count is defective in substance in omitting this allegation. The charge of committing an assault and battery upon a person “ then and there in said house being,” can not, even after the verdict, be construed into an allegation that that person, or any other one, resided or *dwelt in [25> *26 the house. The second count of the indictment charges the offense as in the house “in which the said Aurelius Mason and family then and there lived,” and is in substantial conformity with the statute. This count affords a legal ground for the whole sentence without resorting to the first or third. The rule in criminal cases is the reverse of that which obtains in civil, and if there be good counts to authorize the conviction, the bad ones are held not to vitiate the sentence.
The judgment is affirmed, and remanded back to the court of common pleas for execution.
Note. — The bill of exceptions set forth in the record of the foregoing cause, is copied below as a legal curiosity, •

“ In this case the counsel for the defendant moved to quash the venire for the petit jury, after the case was called and the jurymen had taken their seats in the box, for the reason, that it only contained the names of twelve persons, and because the venire for the grand and petit jury should have been made out together instead of separately (a copy of which venire is hereto attached and made part of this bill of exceptions), which motion was overruled. The counsel for the defendant then called on the clerk for the record of the proceedings under the act relating to juries, and no such record being produced, the defendant’s counsel then offered to prove, by parol, by the clerk of this court, coupled with a motion to set the venire aside and quash the same : 1. That the apportionment, made by the clerk, of jurors, was not in the ratio of the number of free white male inhabitants in each township, contrary to the second section of the act relating to juries. 2. That the clerk did not make, in writ, ing, a statement of the number of jurors apportioned to each township, and deliver the same to the sheriff. 3. That if any apportionment of jurors was made by the clerk, it was not made on the first Monday of September. 4. The clerk has no record of his proceedings in the matter of the said apportionment of jurors. These motions were made after challenges for cause had been made on the part of the prosecution; which testimony, so offered by the defendant, the court overruled and refused to hear, and decided the motion •against the defendant; to all which opinions and doings of the court the said defendant here excepts. And the jury being impaneled and sworn to try the issue joined, the state, in order to make out the issue on her part, produced as a witness, Aurelius Mason, who was sworn, and in his examination in chief, stated that on August 24, 1832, the defendant came to him and said he had a box of saddle-ware at the mouth of Huron, and wanted witness to go with his team and get it. Witness made excuse and said he could not go — this about ten o’clock in the day — that defendant went out and was gone *27 about an hour, and then returned, stating that he could get no other team, and he would not have it remain out on the dock for twenty dollars for that night. .The witness thought at length that he might possibly go, consented and got ready about twelve o’clock, and went down to the mouth of river, and returned with *the box, and left some mill irons at Milan on his return; [26 that he got home a little after dark, eat his supper and went to bed. About ten o’clock in the evening heard footsteps on the porch, and then the person went to the door and gently raised the latch; and that door being fastened he went to the other door, and that being' also fastened, he turned and went to the window, and went past it, and then turned back and raised the window six or eight inches, and then let it down, and then raised it again and put piece of broom handle under the window and partly entered; that the window paper struck his back, and he drew back and stood erect, and then after a little came in gently, some time in getting in, and when in seized hold of the bedclothes and pulled them part of the way down; then witness jumped out ■of the bed and caught him by the hair of his head, and that the defendant •sprang for the window, but witness pulled him back and pulled him down .and put his knee on him, and defendant cried for mercy; that witness held ■the bed-room door while he put some clothes on, and then both defendant and witness went into the other room, and defendant asked to go out to shed and and get his shoes and hat. Witness’ house in Huron county; this affair happened there. Defendant seized the bedclothes near his wife’s shoulder; the person who did this was Frederick Forsythe, the defendant. [The defendant forbears his cross-examination for the present, not waiving the ■right.]
“ Mrs. Mary Mason was then called on behalf of the state, and being sworn, she stated that the first she heard was a footstep on the porch; that the person went to the kitchen door, and then he went to the square room door— then he went to the window, and then he went to the bed-room window and made some noise on the window, and got in and took hold of the clothes and pulled them down from her shoulders; then her husband seized the defendant. About ten o’clock.
“Cross-examined: States that she had not fairly been asleep — in a doze; at first she heard step on the shed, then at the latch of kitchen; it was but little distance from bed-room. He then went to square room door, and then raised the latch of that door, lightly; then went to square room window and tried to raise it; no tapping at door; might have been on bedroom window; gentle taps; window not fastened, that is, bed-room window; the stick had been used under the window, but she did not know where it was then; the window was raised; did not come in, passed, then came in before letting window down; then went directly toward bed; was in his stocking feet on the porch, light step; no carpet in the bed-room; not a word was said; husband had been in bed an hour; she spoke to him in an undertone; said that some person on the porch; did not suspect who until he came; lay still: it was between half and three-fourths • of an hour between the time of his getting on the porch and getting into bed-room; her person not injured; saw Mr. Forsythe; said nothing to her husband; he would see him in morn *28 ing; and the defendant went to the door; no conversation between the defendant and her; and after defendant went away, she asked her husband why he let him go. When she whispered to her husband that some one on porch, husband said, lie still, and we will see who it is; when he went to room window, she told her husband it was Forsythe; in whispers; the head of the-bed was west; saw defendant’s face in window; she lay foreside of bed; there was a man by the name of Sarnia, and one by the name of Felt, boarding there at the time; they slept in another room; Mr. Forsythe lives just opposite; frequently saw defendant; the said boarders not waked that night that she knew; saw defendant that afternoon; just after husband was gone; he came in and handed paper for her husband to take to Milan; did not sit down as she remembered; stayed little while and then went; defendant was at her house twice before her husband went away, to get him to go; said the first time that be wanted her husband to go; not many words passed; nothing said 27] about his coming home, only she asked him when he ®would come; her husband told her that Forsythe had given him one dollar to pay expenses for the night at mouth of Huron; returned a little after dark; was up; did not see the team; when letter brought by Forsythe, he did not say that her husband would stay all night; don’t know but she asked defendant if her-husband could go and get back that night; nothing said about repairing wagon; married before she came here; five years since they went to live where they now live; families of her husband and defendant on good terms; never visited ; Mr. Forsythe was in there occasionally; defendant there frequently last summer; on friendly terms all last summer except one little spell; her husband did not deliver the box that night; next morning it was delivered; Mr. Forsythe occasionally held conversations with her in the absence of her husband at her house. This question was then put by defendant’s attorney: Has-not Forsythe for four or five years past, in the absence of your husband, frequently called in at your house and held conversations with you, and have not you and your husband in all that time been on terms of neighborly and friendly understanding with Forsythe? This question was objected to by the state’s counsel, and by the court overruled, as a question not proper to be put. "Witness stated further, that from the 11th of May to July last year, there "Were hostile feelings existing; do n’t know that there was any on the part of her husband, and between him and Mr. Forsythe, but there was between herself and defendant at the time of the alleged offense. The defendant’s counsel then put the question: "What was the cause of these hostile feelings on. your part? Which question was objected to by the state, and overruled by the court. This question was then put by the defendant: Between the 11th of May last and the 24th of August following, was there not an interchange of neighborly acts between yourself and the defendant? Which question wa3 also objected to by the state, and overruled by the court. This question was then put by the defendant: Do you know of any other reason than that difficulty of the 11th May spoken of, that existed, orthat youhad given that evening, or immediately before, why the defendant should make an attack on your person? She says there was no cause of offense given him before that day; she do n’t know that Mr. Forsythe was angry with her that day or that even *29 ing; defendant had not given any offense that night; no angry words passed that day; all the doors locked that night; was her hahit to fasten the windows nights when her husband absent; did not expect her husband would stay all night; after the defendant came in, or very near in, he tapped; thinks it was on the wall after he came in; her husband wanted her to keep still; when partly in he hit his hack against the window curtain, and drew back again; felt afraid to stay because the neighbors had been disturbed, and she had been a little herself; neighbors all afraid; and I told my husband if he did not come home that night, I would go to my sister's and stay, with my ■children.
“ Ee-examined by the state’s counsel: She says that when defendant handed the paper in after her husband had gone, he said to her, leave that door unfastened, and immediately went out, and she did not answer; she was flustrated; that she told her husband after his return, that defendant had requested the ■door to be left unfastened.
“Aurelius Mason, cross-examined by defendant: Says it was a little after •dark when he came back; drove pretty fast; it was sundown when he was at Milan ; he drove up hack alley or street; he frequently did so late, and he turned his horses in his oat-field; delivered the box next morning; left it by white store next morning; took the box and wagon up there; was about eleven o’clock when defendant went to him to get him to go to Huron with wagon; he, witness, made an excuse; told defendant wagon was loaded and out of order; told defendant he could not get back, and was out of money to •bear expenses, and defendant gave him one dollar, and told him to tell the landlord, in case the bill was more than that, that he would foot it; took paper with directions «where to carry castings that he was to bring from [28 the mouth of Huron; defendant said he would call and leave the order .at his house; did not go into the street that night; set up a little while after hack; it was Friday; had kept the horses a few nights previous in the oat-field; two or three nights only; left the goods out all night in the wagon; water would have run in it if it had rained; cloudy; the first he heard of Mr. Forsythe was on the porch; then it was silent; latch might have been lifted once or twice; latch on the door; there was a bed in the kitchen; he went then to square room door; passed by the window in the bed-room; then turned Around; no stick under the window; window not in general fastened; is toward Jenny’s tavern; window on the east side; bed on the west side, and the head to the porch: twelve lights, 8 by 10 glass, with paper window curtains; one man by the name of Samia, and one by the name of (not recollected), a •shoemaker, that was there; not halloo for them; defendant in the kitchen where fire made; threw him down on the floor; had his hands on his head; had his head out of window; supposes the curtain up; saw him when defendant caught hold of covers; did not see him strike her ; made quick move after in bed; neither shoes nor hat on; that defendant spoke to him at his gate next morning to take a walk; went to tan-yard; went to hark-house; did not name any sum; did not accept any; thinks did not; defendant on Sunday; witness told defendant it was not for him to settle; met three times on Saturday ; had not a conversation at tannery at any time when defendant was called *30 off; it was before breakfast on Saturday that he talked with Forsythe; saw-him in the street; and defendant backward; did not advise with any lawyer to take money; some time in the spring, May last; defendant made an assault on wife, 1832 ; after she told him, witness, that defendant came to house with paper, he suspected defendant; wife did not tell him anything; the reason that he did not prosecute Forsythe Saturday was that he was sick; took the-dollar because he did not know but that he might want it. State rests.
“Defendant called Mr. Horten, who was sworn,'and said that he remembered that Mason went to the mouth of Huron river; did not see Mason that night; witness slept in his shop, fifteen feet only from Mason’s house.
“Mrs. Peverwell was then called on behalf of the defendant, and was-sworn, and the defendant put this question: Do you know that for months-previous to the act complained of, there was a general license on the part of Mrs. Mason, for the defendant to visit her in a confidential manner ? Which question was objected to, and overruled by the court. This question was then-propounded to the witness by defendant: State what you have heard Mrs. Mason say respecting Forsythe’s visiting her, in the absence of her husband, privately and confidentially; which is also objected to by the state, and overruled by the court. The defendant then put this question: Do you know, from Mrs. Mason, or otherwise, that previous to the time when this assault and battery was supposed to have been committed, that Mrs. Mason had given-Mr. Forsythe a general permission to visit her confidentially in the absence •of her husband? Which question was objected to, and overruled by the-court, not because the question was a leading one, but because it was incompetent evidence. The defendant then offered to prove by this witness, that-Mr. Forsythe had been in the habit of visiting Mrs. Mary Mason, in the absence of her husband, with her consent, for illicit purposes — and this previous to the offense laid. Which testimony the court also precluded from going to the jury, and overruled. Whereupon the defendant rested his oause, and takes exception to all' and every of the acts and opinions of the court, in overruling the questions and testimony aforesaid, and in not permitting the defendant to make his defense as he offered to do as aforesaid.
29] “After the argument, the defendant’s counsel requested the court to *instruct the jury as follows, as applicable to all but the last count in the indictment: 1. That every assault and battery includes, as an integral part of it, a rude, wrongful, or angry manner; and in this case, if Mr. Forsythe had not a hostile intention — if he merely wished to have illicit intercourse with Mrs. Mary Mason, with her consent, then the intention on his part to commit an-assault and battery is barred. 2. That the specific intention of beating this woman must be proved; and that it matters not whether she consented or not, if he acted on the faith of any understanding, or supposition of any understanding, or license, it is sufficient for his justification. Her consent or dissent, at the time of the attempt made, constitutes no part of any crime that can be imputed to the defendant; it is only referable to what his intentions were, and if it had so happened that the wife had given encouragement to Mr. Forsythe before her husband had went away from home, and he came back contrary to her expectation, and she had withdrawn her assent after her hus* *31 band’s return, without the defendant’s knowledge, it would operate as fraud on the defendant. 3. If Mr. Forsythe either entered the house, or pulled the clothes down from Mrs. Mason’s person, with an intent of committing adultery with her consent, the defendant is not guilty, for his general illegal intentions, or intention to commit another crime than that charged, not amounting to a felony, can not be applied to this specific offense to make out the guilty intention — that rule only applies to felonies. 4. If the window was not fastened, but continued closed only by its own weight, the raising the window by defendant is no breaking open, within the words of the statute on which this indictment is predicated. 5. That it was -necessary that the defendant should have entered with an intent to commit an assault and battery, and that that intent should be carried into effect. Which instructions the court did refuse to give to the jury, and did instruct the jury, that each and every of said propositions to be unfounded in law, as applicable to this case. And the court did instruct and charge the jury, that if the wife, Mary Mason, had withdrawn her assent, by reason of the return of her husband, as contained in said second proposition submitted by defendant’s counsel, though the defendant acted on the faith of a previous assignation, he was guilty. And the court did further instruct the jury, that if Mr. Forsythe had, previous to-the offense charged, a general license from Mrs. Mary Mason to visit her confidentially, in the absence of her husband, or if he visited Mrs. Mary Mason for illicit purposes, in pursuance of a previous license given him by her, that it still made out no justification for the defendant, unless the jury were satisfied that she assented at the time. And the court did also charge the jury, that no previous consent will justify a wrong-doer in presuming or attempting to commit adultery; that he proceeds at his own peril, and if consent is withdrawn, he is criminal if he uses violence. That if there was any unlawful touching of the person of Mrs. Mary Mason by the defendant, without her consent at the time, it was a personal violence, and the defendant was guilty in so doing.
“To all which opinions, charges, and instructions, and to the refusal of tho court to charge the jury as desired by the defendant, the said defendant now excepts, and prays the court to sign and seal this, his bill of exceptions.”